Daniel J. Kaiser [DJK-9387]
KAISER SAURBORN & MAIR, P.C.
111 Broadway, Suite 1805
New York, New York 10006
(212) 338-9100

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
BENNETT SMITH,

|  |  |
|---|---|
| Plaintiff, | **JURY TRIAL DEMANDED** |
| -against- | **COMPLAINT** |

THOMSON REUTERS,

Defendant.
--------------------------------------------------------X

Plaintiff, **BENNETT SMITH**, by and through his attorneys, Kasier Saurborn &

Mair, P.C., as and for his complaint against the defendant, alleges as follows:

## PARTIES AND VENUE

1.     Plaintiff, Bennett Smith ("plaintiff" or "Smith"), is an individual who, upon

information and belief, was employed by defendant Thomson Reuters.

2.     Defendant Thomson Reuters ("defendant Reuters") is a corporation, former

employer of plaintiff, having a significant presence and doing business in the County of Bergen,

State of New Jersey, whereat plaintiff was employed.

3.     Throughout the course of his Reuters employment, Plaintiff worked at least one

day a week from his home in Ridgewood New Jersey.

4.     Defendant, Reuters, failed to pay to Mr. Smith the full amount of bonus

compensation to which he was contractually entitled. Further, Defendants terminated Mr. Smith

because he opposed business practices that involved making false representations to investors concerning cost and revenue projections relating to business projects. Defendants' conduct constituted both breach of contract and a violation of Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-6(h)(1)(B) and N.J.S.A. 34:191, et seq. [CEPA]

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims asserted herein arise under the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-6(h)(1)(B).

6.     Venue is properly laid in this District pursuant to 28 U.S.C. § 1391 because it is a District in which the defendant resides.

7.     This is a whistleblower retaliation case brought by Mr. Smith against his former employer under the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-6(h)(1)(B) and New Jersey's Conscientious Employee Whistleblower Act ["CEPA"].

## BACKGROUND FACTS

8.     Plaintiff commenced his employment with defendant Reuters during or about September 2015 in the area of technology as the Vice-President of Applications, Ecommerce and Enterprise Workflow.

9.     Plaintiff reported directly to Bahman Koohestani who was Reuters' Chief Technology Officer, of the Intellectual Property and Science Division ("IP&S").

10.     At all times, Plaintiff performed his job responsibilities in superior fashion. He was terminated only because he opposed Defendants' unlawful business practices.

## Mr. Smith Was Not Paid the Full Amount
## Of His Contractual Compensation

11.    Plaintiff was employed pursuant to a contract dated September 11, 2015, which provided compensation at the annualized rate of $305,000.00 as well as a sign-on bonus in the amount of $230,000.00, which was separate and apart from and in addition to plaintiff's annualized rate of compensation.

12.    A significant portion of the sign-on bonus ($184,000.00) was deferred to October 2018.

13.    To the extent any contingencies were included in the employment contract for plaintiff to receive the full sign-on bonus, plaintiff fulfilled them.

14.    As a result, defendant Reuters is liable to plaintiff for the deferred sign-on bonus in the amount of $184,000.00.

15.    Moreover, defendant Reuters maintains a severance policy which provides a payout of twelve months of severance in the event of involuntary termination.

16.    As plaintiff was involuntarily terminated from his position of employment with defendant Reuters, plaintiff is entitled to severance in the amount of $305,000.00.

## Mr. Smith's Whistleblowing and
## Retaliation Against Him by Defendants

17.    Part of plaintiff's job responsibilities included gathering and presenting information to internal and external parties involved in the sale of defendants' IP&S Division, and ultimately, presenting to prospective acquirers in the form of a Confidential Information

3

Memorandum, data room documentation and materials and discussions to be exchanged as necessary in subsequent due diligence sessions facilitating a sale.

18.      On March 8th and 9th, 2016 at Philadelphia headquarters, two days of Business Leadership Team meetings occurred led by Gordon Macomber, Head of Global Operations (effectively COO) for the IP&S Division. These meetings were attended by Mr. Macomber's direct reports (including business owners who Mr. Smith's teams support), plus several from Technology leadership as well as observers from Deloitte.

19.      During the day 1 meeting business owners present their 5yr business plans, as prepared for presentation, to potential acquirers in the sale process. After seeing all of the product plans and projected revenues, Mr. Smith raised the concern that the product roadmaps were aggressive for 2017-18-19 given that the Technology teams were going to be consumed with the separate task of separating all of the IP&S Division's systems, applications and technology from Thomson corporate.

20.      Mr. Smith inquired to Faraaz Khan, the Head of Strategy & Planning for the Business teams, if the business separation plans had been coordinated with Deloitte and the Technology separation plans.  Mr. Khan answered affirmatively. This turned out to be untrue. Mr. Smith communicated at this meeting that the product development efforts required, and correspondingly the revenue projections, would be constrained by the lack of Technology resources.  Messrs. Macomber and Khan were visibly shaken by Ms. Smith's revelation.

21.      On March 14th, 2016 Mr. Smith participated in a conference call along with Mr. Koohestani's direct reports. This constituted a Weekly Technology Leadership staff meeting.

4

22.     Mr. Smith's colleagues, VP's of Technology Product and Program Management, who attended the Leadership Team meetings updated their fellow VP's on these meetings. They detailed the concerns Mr. Smith raised and the reaction of Mr. Khan, who they described as having lost all the color in his face upon realizing the issue with the business projections.

23.     During a March 18, 2016 conference call a Charter Review was presented in preparation for Camelot Executive Steering Committee presentation. Participants on the call included Deloitte, Mr. Koohestani, Mr. Smith, and another technology VP.  Mr. Smith was expected to walk through presentation of all of his teams' charters as updated from the previous day.

24.     Mr. Smith expressed concern and discomfort concerning preparation of Charter information.  Mr. Smith expressed his concern that he was not comfortable presenting the content. Deloitte team objected stating we had been working through these since November.

25.     Mr. Koohestani's response was "This is the movie you're in." "You own it." Mr. Smith, told him he expected the call to be a working session to talk through his teams' concerns, comments as well as other information aggregated by Deloitte in the charter's.

26.     Mr. Koohestani took the lead on the call and proceeded to direct Deloitte to remove the side comments from the teams, also to remove certain explicit complexity, risks and costs that were added by the teams, and directed Deloitte to "soften the language" in certain line items that could be considered negative or highlighting concerns with impact of the new separation strategy.

27.     Finally, Mr. Koohestani also revealed that Mr. Smith would be presenting the Charters to the Executive Steering Committee on Tuesday the following week and essentially

issued what Mr. Smith took as an ultimatum to commit on the call to going forward.  In Mr. Smith's view, it was either remain silent and accept or object further and lose his job.

28.     At this point, Mr. Smith became extremely anxious.  The implications of the charters being manipulated was now clear.  The company was intentionally minimizing timelines, resource requirements, complexity, risk and costs and this data would be conveyed in the sale process to third parties.  That evening Mr. Smith sent Mr. Koohestani an email requesting to talk over the weekend.  He declined and said they would talk early next week.  Mr. Smith's email inquired about his movie remark which stunned him.

29.     On March 19th and 20th, 2016, deeply concerned that Thompson Reuters was now crossing into the territory of securities law violations, and concerned about his own potential liability Mr. Smith began searching for Sarbanes-Oxley and employment attorneys.

30.     On March 21st, 2016, subsequent to a follow-up preparation call with Deloitte, Mr. Koohestani called and asked if Mr. Smith was okay.  They discussed Mr. Smith's concerns about the timelines and complexities and the corresponding impact upon costs and revenue projections.  Mr. Koohestani asked what he would suggest.  Mr. Smith urged that the Company engage some experts to do a detailed assessment and develop a more accurate view of the effort and risks for the new separation approach.  Mr. Koohestani asserted "the Company will not pay for it", and "regardless of what's in the charters, we both know everything is going to break when we make this type of undertaking anyway."

31.     On March 22, 2016 Mr. Smith participated in a Camelot Executive Steering Committee presentation. Mr. Kahn raised questions concerning resource constraints and if any

syncing was needed with the business team plans and technology team plans.  Mr. Koohestani falsely asserted that the two plans were completely separate and did not require syncing.

32.     On March 23, 2016 Mr. Smith participated in a call with Mr. Koohestani. They discussed the issue Mr. Kahn raised in the previous day's Steering Committee call.  Mr. Koohestani was irritated with Mr. Kahn for raising the resource coordination question.  Mr. Smith told him that he shared Mr. Kahn's concern that stemmed directly from discussions in the March 8th Philadelphia session, and that by not coordinating with the business plan, the Company was overstating product development and revenue projections.

33.     Further, Mr. Smith stated that the costs for product development were not accurately reflected in our separation plans because the same teams with subject matter expertise of our applications are required for both product development and technical separation. Mr. Koohestani dismissively brushed off Mr. Smith's concerns stating that those are business costs and that will be the buyer's problem to deal with.

34.     At this point, Mr. Smith's ethical concerns regarding the Company's business practices were extreme.  While he recognized that he could not participate in what effectively was now a fraud, he also could not afford to be terminated. He was deeply conflicted. Mr. Smith begins asserting other concerns and excuses so that he could avoid further meetings relating to the fraudulent conduct.  Mr. Koohestani, however, presses him to continue with the sales process. Mr. Smith was uncomfortable continuing a sales process premised upon false data.

35.     On March 30, 2016 Mr. Smith sends an email to Mr. Koohestani escalating his concerns and explicitly citing his discomfort with the sale process and informing him that he had

to seek legal guidance on the situation. Mr. Koohestani replied with email calling out Mr.

Smith's statements about sale process and requesting more detail to be sent by 8pm deadline.

Just before 8pm, Mr. Smith called him.

36.     During this call, Mr. Koohestani stated that Mr. Smith should understand legal is

involved at this point. During the call Mr. Koohestani inquired whether Mr. Koohestani

personally needed to be concerned.  Mr. Smith responded that he would not know until he

communicated with counsel.

37.     On March 31st, 2016 Mr. Smith received and email from Mr. Koohestani

informing him that he was terminated immediately. On April 1st, 2016, Mr. Smith received a

formal written termination notice.

38.     Defendant Koohestani, acting as an agent for defendant Reuters in his capacity as

Chief Technology Officer, directed plaintiff to present false and misleading information to the

Executive Steering Committee, which would ultimately be presented to outside investors,

regardless of its accuracy or veracity.

39.     Plaintiff, reasonably believing that the ultimate presentation, and thereby

personally endorsing, inaccurate and false information that would ultimately be conveyed to

investors, in a deal valued at or about $3,000,000,000.00, was fraud and illegal in nature, advised

defendant Koohestani that he could not continue to participate in the sales process without first

communicating with an attorney.

40.     Defendant Koohestani refused to properly consider plaintiff's concerns and

demanded that plaintiff present such information regardless of its accuracy or veracity which, not

having a choice as he feared retaliation/termination, plaintiff presented.

41.     Plaintiff was terminated because he objected to and opposed unlawful business practices that constituted fraud and that violated United States securities laws, including but not limited to, rules and regulations that prohibit presenting false and misleading financial information to potential investors.

42.     No legitimate reasons existed to terminate Plaintiff's employment. Defendants' true motivation to fire Plaintiff was that he opposed and objected to Defendants' unlawful business practices.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

43.     Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "42" as if fully set forth herein verbatim and at length.

44.     Plaintiff was employed pursuant to a contract dated September 11, 2015.

45.     Plaintiff performed all duties and obligations owed by him pursuant to such contract.

46.     Defendants failed to perform their duties and obligations owed by them pursuant to such contract including, but not limited to, compensating plaintiff his sign-on bonus in the amount of $184,000.00 as well as accrued severance in the amount of $305,000.00.

47.     Defendants breached the contract of employed entered into with plaintiff.

48.     As the direct result of defendants' breach, plaintiff was damaged in the amount of $489,000.00.

## SECOND CAUSE OF ACTION
### (Breach of Good Faith and Fair Dealing)

49.     Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "42" and "44" through "48" as if fully set forth herein verbatim and at length.

50.     In New Jersey, it is implied and understood that each party to a contractual relationship must act in good faith and deal fairly with the other party in performing its obligations.

51.     There existed express and implied contractual relationships between plaintiff and the defendants.

52.     Each of the defendants acted in bad faith or with improper motive to destroy or injure the rights of plaintiff to receive the benefits and/or reasonable expectations of such contractual relationships.

53.     Defendants breached their independent and collective duties of the implied covenant of good faith and fair dealing.

54.     Plaintiff has suffered and continues to suffer resulting damages.

## THIRD CAUSE OF ACTION
### (Unjust Enrichment)

55.     Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "42" and "44" through "48"  and  "50" through "54" as if fully set forth herein verbatim and at length.

56.     Plaintiff satisfied its obligations under the terms of the Contract.

57.     Defendants received the benefit of the services provided by plaintiff under the terms of the Contract.

10

58.     Defendants failed to provide proper compensation and monies owed for the benefit of the services provided by plaintiff, conferring benefits to defendants to which they are not entitled, resulting in defendants' unjust enrichment.

59.     Plaintiff has suffered and continues to suffer resulting damages.

## FOURTH CAUSE OF ACTION
### (Conscientious Employee Protection Act ("CEPA"))

60.     Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "44" and "44" through "48"  and  "50" through "54"  and "55" through "57"as if fully set forth herein verbatim and at length.

61.     Plaintiff was terminated because he opposed and objected to Defendants' unlawful business practices which constituted fraud and further violated U.S. securities laws.

62.     Defendants' actions violated the Conscientious Employee Protection Act, N.J.S.A. 34:191, et seq. ("CEPA").

63.     As a result of defendants' conduct, plaintiff suffered injury and damages.

## PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY

**WHEREFORE**, plaintiff demands judgment against defendants as follows:

(i)     compensatory damages;

(ii)    front pay;

(iii)   back pay;

(iv)    non-compensatory damages;

(v)     emotional distress;

(vi)    punitive damages;

(vii)   interest;

11

(viii)    attorneys' fees;

(ix)      costs; and

(x)       such other and further relief as the Court deems fair and equitable.

Dated: New York, New York
       October 24, 2016

**KAISER SAURBORN & MAIR, P.C.**
Attorneys for Plaintiff

By: _____
       Daniel J. Kaiser, Esq.

111 Broadway, Suite 1805
New York, New York 10006